IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 7, 2024 Session

## BARBARA J. TODD v. METROPOLITAN HISTORIC ZONING COMMISSION OF THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE

Appeal from the Chancery Court for Davidson County
No. 20-0918-IV      Russell T. Perkins, Chancellor

_____

No. M2023-01714-COA-R3-CV

_____

After a hearing before the Metropolitan Historic Zoning Commission, the appellant homeowner was ordered to remove a covered porch addition that was constructed without a preservation permit, as the Commission determined that the addition did not comply with the applicable design guidelines. The homeowner filed a petition for writ of certiorari, and the chancery court held a de novo hearing on the matter. After the evidentiary hearing, the chancery court likewise determined that the unpermitted covered porch did not meet the applicable design guidelines, and the court ordered its removal. The homeowner appeals, arguing that her due process rights were violated due to untimely notice of the hearing before the Commission and that the chancery court erred in finding that her covered porch was not in compliance with the guidelines. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Adam G. LaFevor, Nashville, Tennessee, for the appellant, Barbara J. Todd, Trustee of the Barbara Todd 2017 Trust.

Catherine J. Pham, Kelli F. Woodward, and Abby Greer, Nashville, Tennessee, for the appellee, Metropolitan Historic Zoning Commission.

**OPINION**

## I. FACTS & PROCEDURAL HISTORY

Barbara Todd, Trustee of the Barbara Todd 2017 Trust, purchased a home at 1013 Paris Avenue in Nashville in October 2019. The previous owner had recently added a rear addition and a separate side addition to the home. At closing, the seller agreed to finish a few construction items that remained unfinished. Ms. Todd eventually resorted to litigation to resolve disputes over these issues, and she hired another contractor, Paul Martin, to complete some remaining work at the home. Ms. Todd also directed Mr. Martin to convert an uncovered deck at the rear corner of the home, between the newly constructed side and rear additions, into a covered porch with an outdoor fireplace and masonry chimney.

Ms. Todd's home is a circa 1910 Victorian cottage that lies within the Waverly-Belmont Neighborhood Conservation Zoning Overlay. The previous owner's architect had obtained a preservation permit from the Historic Zoning Commission approving the construction of the rear and side additions to the home.[1] However, that permit was "clos[ed] out" upon final inspection of the additions by Commission staff prior to Ms. Todd's purchase of the home. Mr. Martin was aware that Ms. Todd's property was within the zoning overlay when he took on the project, but he did not review the preservation permit that had previously been issued, nor did he apply for a new preservation permit.

On July 23, 2020, the previous contractor who was involved with the home contacted staff at the Historic Zoning Commission to convey some concerns regarding what he had observed in the ongoing construction of the covered porch. He first informed the Commission staff that he was no longer working on the house and sought to ensure that the permits previously obtained had been canceled or closed out. The contractor also explained that he had been "specifically told we could NOT cover the rear deck" behind

---

[1] Tennessee Code Annotated section 13-7-407(a) provides:

> All applications for permits for construction, alteration, repair, rehabilitation, relocation or demolition of any building, structure or other improvement to real estate situated within a historic zone or district shall be referred to the historic zoning commission or the regional historic zoning commission, which shall have broad powers to request detailed construction plans and related data pertinent to thorough review of the proposal. The historic zoning commission or the regional historic zoning commission may also be authorized to review the construction, alteration, rehabilitation, relocation or demolition of any building, structure or other improvement on real property, whether privately or publicly owned, which is situated in a historic district or zone, and for which a permit is not required. No construction, alteration, repair, rehabilitation, relocation or demolition of any building, structure or other improvement to real property situated within a historic district or zone, for which the historic zoning commission or the regional historic zoning commission has been granted the authority to review and to grant or deny a certificate of appropriateness, shall be performed without the issuance of a certificate of appropriateness.

The document that was previously called a "certificate of appropriateness" is now called a "preservation permit."

the side addition because it would violate the applicable design guidelines related to side additions and cover the rear corner of the original historic house, and yet the new contractor appeared to be doing just that.[2] Thus, the previous contractor inquired as to whether a preservation permit had been granted for this work and why such an addition was now being allowed.

Upon investigation by the staff of the Historic Zoning Commission that same day, staff member Fred Zahn sent the following email to the Historic Zoning Administrator, Robin Ziegler:

> Spoke with contractor, Paul Martin, and asked about violation. He said the work had been started by a previous contractor who left the job 1/2 complete, and that he had misunderstood what has and has not been approved. He is stopping work on it and intends to create as-built drawings of the porch and apply by Aug. 3rd *to be heard for retroactive approval of the structure by the MHZC at the Aug. 19th meeting.*

(emphasis added). Ms. Ziegler responded and asked if Mr. Martin was aware that the project would likely be recommended for disapproval and inquired as to whether there was any discussion about correction. Mr. Zahn responded:

> Yes, I told him it was my understanding that element of the larger project had been discussed previously and removed from the application. It is essentially done and he is no worse off at least asking to retain. If the commission disapproves then he is where he is today. I explained that we do not review "decks" in a conservation overlay, but the roof structure made it a "porch" which would require approval.

---

[2] Pursuant to Tennessee Code Annotated section 13-7-406, "[p]rior to the establishment of any historic district or zone, the historic zoning commission . . . also shall adopt for each such proposed district or zone a set of review guidelines, which it will apply in ruling upon the granting or denial of a certificate of appropriateness as provided for in this part." Regarding the guidelines, Tennessee Code Annotated section 13-7-408 further provides, in relevant part:

> In its review of any such work to be undertaken in a historic district or zone, the historic zoning commission . . . shall apply the applicable review guidelines and give prime consideration to:
> (1)     Historic or architectural value of the present structure;
> (2)     The relationship of the exterior architectural features of such structure to the rest of the structures, to the surrounding area, and to the character of the district;
> (3)     The general compatibility of exterior design, arrangement, texture, and materials proposed to be used; and
> (4)     Any other factor, including aesthetic, which is reasonably related to the purposes of this part.

All of these emails are dated July 23.

On August 5, another staff member, Sean Alexander, emailed Mr. Martin and asked what information Mr. Martin could provide about the porch addition. Mr. Alexander explained in his email that in a conservation overlay, any new construction, including additions, needs to be reviewed and approved by the Commission. According to Mr. Martin, he called Mr. Alexander to discuss the matter by phone. On August 13, when the Commission posted its agenda for its upcoming meeting, Mr. Alexander sent another email to Mr. Martin, informing him that his "application for approval after-the-fact" was on the agenda for the August 19 meeting. Due to Covid-19 restrictions in place at the time, the meeting would be held virtually via teleconference. The email explained that each applicant would have up to ten minutes to present his or her position to the Commission, and the Commission would consider any drawings or information sent in advance of the meeting. The email informed Mr. Martin that the Commission staff would be recommending removal of the unpermitted porch within sixty days because it wrapped the back corner between the two additions continuously, which was inconsistent with previous Commission approvals and did not meet the design guidelines applicable to rear and side additions. Mr. Martin responded to this email and stated that he and Ms. Todd both desired to speak and address the Commission.

At the August 19 meeting of the Historic Zoning Commission, Ms. Ziegler began by presenting the position and recommendation of staff regarding the project. She explained that a rear addition and a separate side addition had been approved in July 2018, but the two additions were distinct with an uncovered deck in the area between them. She said the two additions passed final inspection, and the permit for that project was closed. She stated that in July 2020, Commission staff observed the construction of a covered porch in progress, which connected the rear addition to the side addition. Ms. Ziegler explained that in situations where a side addition is deemed appropriate for a home, the Commission typically says that the side addition needs to be separate from the rear addition rather than having a single addition essentially wrapping the corner of the home continuously from the rear to the side. She explained that Ms. Todd's covered porch addition made the rear and side additions continuous, which was not consistent with previous Commission approvals or the sections of the design guidelines that govern rear and side additions. Thus, the staff recommendation was for removal of the unpermitted porch within sixty days.

Mr. Martin addressed the Commission next. He began by stating, "We've kind of been in a state of confusion." Mr. Martin explained that he "took over this project" after Ms. Todd purchased the home. He stated that the homeowner had been "shown" a set of plans that included a covered porch on the rear. He stated that he was brought on to finish a list of items, and this was one of those items. Mr. Martin claimed that he had "asked for" the building *and* historical permit to be "transferred over," and it was his understanding that this porch was part of the previous permit. Thus, Mr. Martin stated that he was "kind of in shock" when he was contacted by Commission staff about the project. He said that

- 4 -

he and Ms. Todd had "immediately called an architect" and tried to get them out but "this has all happened over the last week and a half," and the architect could not come out until Friday. He added that "we thought we were doing what was planned by the original builder during the purchase" and "didn't realize that – that those two things weren't connecting."

Ms. Todd also spoke. She began by stating that this experience was "quite a shock" to her and that she was "bewildered." She noted the problems she had experienced with the previous owner and the litigation that resulted. Ms. Todd claimed she had asked many times for the survey of the lot and plans for the house, but the owner "never provided me anything." She said she had no idea she was "imposing upon anything." Ms. Todd said she had not been given enough time to "formulate a game plan" and hoped that the matter could be deferred to a later date so that she could gather some information and determine how to approach the matter.

The Commissioners then proceeded to ask questions of Ms. Todd, Mr. Martin, and Ms. Ziegler.[3] Ms. Todd reiterated that she "saw plans" when she made the offer on her house, but after she closed, the previous owner refused to give them to her. She claimed that the previous owner was in the wrong, she was simply "caught in the middle," and she had no intention of doing anything that was not approved. However, Ms. Ziegler explained that "the drawings are attached to the permit." Mr. Martin again expressed confusion about why the previous permit was closed. A Commissioner pointed out, however, that in a situation where a new builder takes over a project, he or she must follow the previous permit, do only what was previously permitted, and limit construction to what has been approved by the Commission. So, if Mr. Martin claimed to be following the previous permit or believed it was transferred, the Commissioner questioned how the uncovered porch and chimney could have been added when they were not allowed under the previous permit. Another Commissioner agreed, explaining that when a contractor changes, the new contractor must build "to that set of drawings that has been approved."

Mr. Martin again stated that the previous contractor "had a set of plans with this on it." However, he then explained that he had learned, in his discussions with Mr. Zahn, that the covered porch "was something that was originally applied for and then rejected." Mr. Martin explained that this information had not been shared with him previously and "that is where the confusion comes in." He stated, "I saw a set of plans with this on it, and so it was my belief that that is what was approved. . . . We had no clue that that was not an approved set of plans." Mr. Martin said he did not know at the time that those plans were rejected, nor did he know that the preservation permit was closed out.

---

[3] Ms. Ziegler explained that the Commission staff decided not to classify this situation as a "show cause" matter because the permit from the previous work had already been closed out before this work began. Thus, in their view, it was not a situation in which someone with a permit had deviated from its scope but rather someone doing work without applying for a permit.

A Commissioner stated that to the extent there was any misrepresentation, it would have been by the seller because the preservation permit did not include the covered porch, but in that event, a buyer's recourse is against the seller. He also opined that the Commission was "not in a position" to retroactively allow something that is not reflected on any set of drawings submitted to or approved by the appropriate authorities. The Commissioners discussed Ms. Todd's request for a deferral but expressed concern about having to "rehear" the matter and the possibility of reviewing "anything new" done to the project in the interim. After again discussing a homeowner's recourse against a seller, the Commissioners conveyed their sympathy for Ms. Todd's situation but emphasized their duty to apply the guidelines of the overlay. The Commissioners unanimously approved the staff's recommendation of removal of the covered porch because of its failure to comply with the guidelines, although they extended the removal window to ninety days.

Ms. Todd timely filed a petition for writ of certiorari in chancery court. She sought a trial de novo pursuant to Tennessee Code Annotated section 13-7-409, which provides:

> Anyone who may be aggrieved by any final order or judgment of the historic zoning commission . . . may have such order or judgment reviewed by the courts by the procedure of statutory certiorari, as provided in title 27, chapter 8.[4]

The chancery court issued the writ and directed the Commission to certify and forward the record of the administrative proceedings to the court. Prior to the trial date, Ms. Todd filed a brief arguing that her due process rights were violated because she only received notice of the hearing before the Commission three business days before it was held. She also argued that the covered porch addition was "not addressed" by the design guidelines. The Metropolitan Government of Nashville and Davidson County ("Metro") filed a brief on behalf of the Commission, pointing out that Ms. Todd's contractor was informed of the violation on July 23, almost a month before the meeting, and he reportedly indicated to staff that he would prepare drawings for review at the August 19 meeting. Alternatively, Metro argued that Ms. Todd had no interest entitled to the protections of due process because she had no permit. Finally, Metro argued that the Commission reasonably applied

---

[4] Regarding Tennessee Code Annotated section 13-7-409, this Court has explained:

> A chancery court's review under the statutory writ is by trial de novo. *McCallen v. City of Memphis*, 786 S.W.2d 633, 638 (Tenn. 1990). Here, "de novo" means that the chancery court's review is not limited to the administrative record. *Tennessee Waste Movers, Inc. v. Loudon County*, 160 S.W.3d 517, 520 (Tenn. 2005). The chancery court holds a new hearing "based upon the administrative record and any additional or supplemental evidence which either party wishes to adduce relevant to any issue." *Id.* (quoting *Frye v. Memphis State Univ.*, 671 S.W.2d 467, 469 (Tenn. 1984)).

*MJM Real Est. Invs., LLC v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M2017-01166-COA-R3-CV, 2018 WL 1560650, at *3 (Tenn. Ct. App. Mar. 29, 2018).

the design guidelines in concluding that the porch addition was impermissible.

The chancery court conducted an evidentiary hearing on June 30, 2021. During opening statements, Ms. Todd again raised her argument regarding due process, claiming that she only had notice of the August 19 Commission hearing three business days before it occurred. In response, Metro pointed out that Ms. Todd had a statutory right to a de novo trial in chancery court, so the court could "hear it de novo and address the issue now," and there was no need to send the matter back to the Commission due to any insufficient notice. Thus, according to Metro, any alleged error was "cured essentially" by the de novo review in chancery court.

Only three witnesses testified in chancery court: Ms. Todd, Mr. Martin, and Sean Alexander, who was on staff with the Commission. Aside from the administrative record, the chancery court admitted various exhibits submitted by the parties. In particular, we note the following photographs that depict the uncovered deck as it previously existed and the portions of the newly constructed covered porch addition that are now visible from the street:





Ms. Todd was the first to testify at the hearing in chancery court. She explained the circumstances surrounding her purchase of the property and said she thought there was going to be a back porch on the house when she contemplated the purchase. However, when asked "if there ever were drawings of the covered porch," Ms. Todd said she was not aware of any and had never seen any. She said that the first contractor did not leave plans despite her repeated requests for them. Thus, Ms. Todd said that she understood there would be a covered porch from speaking with the original owner, but she had not seen any plans showing one.

Ms. Todd testified that her wooden uncovered deck had been replaced with an enclosed porch with cement flooring. She explained that the original corner of her house was "not disturbed" and "just has a roof" over it now. When asked if she knew, when they began construction, that a permit would be required for such work, Ms. Todd said she had no idea. She believed that the first contractor had pulled permits. Ms. Todd acknowledged that she contacted the Codes Department about canceling some permits due to the pending litigation with her previous contractor, but she conceded that she did not "know the specifics" about the permits. Ms. Todd admitted that she had "authorized Mr. Martin to pull permits on [her] behalf" after she terminated the first contractor.[5] She said she did not

---

[5] The administrative record contains a *building* permit from Metro's Department of Codes and Building Safety issued March 2, 2020, and it listed the applicant as Paul Martin Builders, LLC. It stated, "I hereby

personally review any of the permits.

Ms. Todd testified that she did not learn about the August 19 Commission hearing until Monday August 17, so she only had about two days' notice. She testified that she "panicked" and "scrambled" to find an architect, but no one was available at that time. Ms. Todd noted that she had requested a deferral of the hearing but the Commission proceeded anyway. It was her understanding that Mr. Martin "found out about the hearing" on the previous Thursday, August 13. However, Ms. Todd admitted she had since learned that Mr. Martin was informed of the need to stop work on the property on July 23.

Given Ms. Todd's testimony that she sought a deferral of the Commission hearing in order to gather more information, she was asked on cross-examination to describe what information she had gathered in the ten months since the Commission hearing. Ms. Todd said she had contacted the lawyer who was representing her in chancery court, and she had also "tried to contact an architect" but never hired one. She did not have any drawings of the porch prepared. Still, when asked if she was "planning on presenting everything" to the chancery court that day, Ms. Todd responded affirmatively, noting that she hoped the matter was resolved that day. Ms. Todd was asked, "[W]hat are you asking This Court to do?" She responded, "I'm asking This Court to allow me to keep my porch."

Mr. Martin also testified. When asked if he ever saw any plans for the house that depicted a covered porch, Mr. Martin responded affirmatively. He testified that he saw the plans before he commenced work. Mr. Martin said he did not know that the plans he saw had been denied until after he already constructed the porch. Mr. Martin described his conversation with Mr. Zahn, who told him, "Oh, those were plans that were submitted, but they weren't approved. You got the wrong set of plans." He said Mr. Zahn discussed potential alternatives and suggested talking to an architect. Mr. Martin said he stopped work on the project in response to this conversation because he realized "there was an issue" and did not want to proceed further. He testified that he told Ms. Todd about the issue but could not recall when.

Even though Mr. Martin had stopped work on the project, he testified that "the first time [he was] notified that [he was] going to be at a commission meeting" was on August 13, when he received the email with the August 19 meeting agenda. He insisted, "I didn't know that we were going to have to go before the commission until that email came." Mr. Martin testified that he called Sean Alexander and asked for a deferral so that he could contact an architect, and Mr. Alexander told him that he would have to get back to him. Mr. Martin said the next time he emailed Mr. Alexander, he received an out of office email

---

certify that I am the agent of the owner, or other person in control of this property, and that the information given herein, and as shown on the application and the permit, is true; and that I am authorized by said owner, or other person in control of this property, to obtain this permit." However, the building permit stated that no exterior work was included in the scope of the permit.

- 9 -

notification, so the two never communicated again.

Like Ms. Todd, Mr. Martin testified that the original corner of Ms. Todd's home was not altered; he simply "put a roof on top of it." He also added two walls and an outdoor fireplace. He said he was not familiar with the term "wrapping the corner." However, it was his understanding that the Commission did not want the porch to connect the original corner of the house with the addition. Based on his experience as a licensed contractor who had worked in historic neighborhoods, Mr. Martin opined that a permit was not needed in order to build "an exterior chimney off a back porch." He was not aware of anything in the design guidelines regulating outdoor fireplaces. Mr. Martin explained that to his knowledge, the guidelines "just apply to things that can be seen from a public right-of-way." Mr. Martin testified that none of the covered porch could be seen from the public right-of-way from "the front" of the house.

During cross-examination, Mr. Martin acknowledged that he had only been involved with seven to ten preservation permits in his career, and he had only appeared before the Commission twice, with both of those appearances being for what the Commission characterized as violations. Mr. Martin admitted that he knew, when he took on this project, that the previous work had required a preservation permit, and yet he did not review the preservation permit that had been issued. Instead, he "saw" plans at the house that he believed were left by the original contractor and "used them as a guideline" in building the porch, only to learn later that they were not the final plans approved by the Commission. He said he did not have a copy of those plans at the time of trial and did not know what happened to them. However, Mr. Martin said he was in possession of them prior to the August 19 Commission meeting. When asked why he needed an architect if he already possessed plans showing the covered porch, Mr. Martin said it was his understanding that "we needed an architect to come up with some sort of compromise that Historic could be happy with." Mr. Martin testified he had not retained an architect in the ten months since the date of the Commission hearing because he left the matter up to Ms. Todd.

The final witness to testify was Sean Alexander, a historic preservationist on staff with the Commission since 2007. Ms. Todd had no objection to him being deemed an expert in historic preservation, specifically for Nashville. Mr. Alexander was not involved with the property at the time of the preservation permit authorizing the rear and side additions, but he had reviewed the matter upon discovery of the covered porch being constructed without a permit and considered it as an "after-the-fact review." Mr. Alexander acknowledged that in the typical case, an applicant applies for a permit, with the understanding that doing so will place the matter on the agenda. He explained that in situations in which work is being done without a permit, no application has been submitted to the Commission, so the Commission is essentially requesting that the person come before the Commission for review. He noted that Commission meetings are held "on the third Wednesday" of the month, and agendas are typically posted on Wednesdays or

Thursdays during the week before the meeting. Mr. Alexander testified that, based on the administrative record of the emails exchanged during that time, Mr. Martin was informed by Mr. Zahn that he would need to go before the Commission long before the official agenda was sent to him on August 13. He did not recall Mr. Martin ever asking him for any deferral prior to the Commission meeting.

Mr. Alexander had prepared the staff recommendation to disapprove the porch, but he was out of town on the day of the Commission meeting, so Robin Ziegler had presented his presentation. Mr. Alexander testified that the applicable design guidelines state that an addition to a home should generally be located at the rear in such a way that it will not disturb the front or side facades. The guidelines provide that side additions may be permitted if the lot is wide enough. However, he said that the guidelines also explain how additions should be physically distinguished from the historic building itself and should generally fit within the shadow line or silhouette of the building. Mr. Alexander also explained that the design guidelines have a section specifically addressing rear additions and a separate section addressing side additions. Thus, he emphasized that "these are separate headings because they are treated as separate additions." He added, "You can do a rear addition, and you can do a side addition."

Mr. Alexander explained that the Commission had approved a rear addition and a separate side addition for Ms. Todd's home in 2018. However, the staff recommendation from that project noted that the addition would be beyond the midpoint of the home, it would be minimally visible from the street, etc. The side addition was "contained within the side wall of the structure," set forward from the rear of the structure, and separate and independent from the rear addition. The drawings showed the location of the uncovered deck, but the Commission does not review uncovered decks.

Mr. Alexander testified that "wrapping the corner" refers to construction that goes from the rear addition and connects to the side. In other words, it is not a distinct side addition or a rear addition; it is one addition that "engulfs" two sides of the house. Mr. Alexander testified that Ms. Todd's newly constructed covered porch addition "blurred the space" between a rear addition and a side addition and is "essentially both or neither." He said it "sort of straddles" the section on rear additions and the section on side additions. Still, Mr. Alexander explained that all of the design guidelines "work together" and that one of their primary purposes is to allow additions to enlarge homes in a way that will not permanently impair the historic form of a structure. Thus, he explained that the goal is to preserve the corners of historic houses because engulfing a corner is less removable and has a more permanent impact on the historic form.[6] He recalled "a few, very small number"

---

[6] Mr. Alexander noted Mr. Martin's testimony that the roof of Ms. Todd's porch could be removed without disturbing the historic corner of the house, but he questioned whether this was accurate when it came to the corner, eave, soffit, and fascia, as the roof appeared to be "built up over the corner of the roof." He also explained that Mr. Martin did not simply add a roof; he had also replaced the floor, did work to the foundation of the porch, added a chimney, and added a wall with siding that tied into a portion of the

of homes with rather unique circumstances in which additions had been approved that wrapped a corner, noting that such circumstances might include very shallow lots, having previous additions that already impacted the corners, etc.

Mr. Alexander conceded that the "controlling" part of the design guidelines themselves did not contain the phrase "wrapping the corner." Instead, it was only in italicized text that had been added to the document to serve as guidance to applicants about how the guidelines have been interpreted based on precedents or traditions that developed over time. Mr. Alexander explained that the guidelines themselves are adopted by the Historic Zoning Commission, while the italicized guidance is not. Accordingly, he agreed that express language regarding wrapping the corner was not in the "mandatory" part of the guidelines. However, he noted that new guidelines had recently been revised to expressly state in non-italicized language that "an addition is designed to leave the corners of the building visible and intact and does not wrap the corner." Mr. Alexander said that the prohibition on wrapping a corner between rear and side additions was "such a long and consistently upheld precedent" that the Commission decided to include it in the guidelines when they were revised.

Mr. Alexander was also asked by counsel for Ms. Todd about how the guidelines apply to work that cannot be seen from a public right-of-way. The first pages of the guidelines contained general bullet points in the margin listing items that are reviewed and items that are not reviewed in a neighborhood conservation zoning overlay. Under "What is Reviewed," it included "Additions – increased footprint, height or building envelope of an existing structure." Under "What is Not Reviewed," it listed "Work that cannot be seen from the public right-of-way (not including alleys)." However, for this bullet point, it added, "To avoid a possible violation, the project should be evaluated by staff for assurance that a Preservation Permit is not necessary." When counsel asked Mr. Alexander if this means that "you only govern what's seen from the street," Mr. Alexander disagreed. He pointed out that the guidelines also stated, "These guidelines shall apply only to the exteriors of buildings and to new construction that would have at least a portion visible from a public right-of-way." As such, Mr. Alexander clarified that the guidelines apply if at least a portion is visible. He agreed that if *no* portion of an addition was visible from the street, then it would not necessarily need a preservation permit.

For Ms. Todd's covered porch, Mr. Alexander testified that a portion of the addition is visible from the public right-of-way. He clarified that the guidelines apply when anything is visible from "the public right-of-way," and this is not limited to the view when standing directly in the front and center of a house. Instead, this could include the sidewalk or street running along the front of a property, as seen from a reasonable distance, including one or two houses down the street. Referencing a photograph, he stated that one could see, from the right-of-way, the chimney constructed by Mr. Martin, a portion of a wall, "this

_____

approved addition.

- 12 -

entire section of roof," a bit of siding, and "the gutter and eave of that portion of the roof." Because a portion of the addition was visible, he opined that the guidelines applied to enable the Commission to review the exterior. He also explained that the guidelines apply to the addition, so they would also apply to the chimney that is part of the addition.

Finally, Mr. Alexander was asked if he was aware that Ms. Todd had offered to remove all portions of the gutters and the roof that could be seen from a public right-of-way. Mr. Alexander responded, "I was not aware of that." He acknowledged that he read something to that effect in Ms. Todd's pretrial brief, but he said that information had never been communicated to him by either Ms. Todd or Mr. Martin. When asked if Ms. Todd was given ninety days to try to work out a solution, Mr. Alexander disagreed with counsel's characterization and said that she had ninety days to remove the porch. Mr. Alexander again testified that he "did not see, read or receive any communication" from Ms. Todd's representation regarding a "solution." However, he noted that once the Commission has made a decision, a staff member could not override or supersede that decision. He said an applicant could ask for a rehearing or appeal the decision. Mr. Alexander was then asked if it would "surprise [him] to know" that Ms. Todd offered to remove all portions of the roof and gutter visible from the right-of-way and that offer was declined, and Mr. Alexander said he would be surprised if he was to hear that was the case. However, Mr. Alexander reiterated that he was not aware of Ms. Todd making any proposals to make revisions to the structure or remove portions of it.

In closing arguments, Ms. Todd maintained that her due process rights were violated by untimely notice of the hearing before the Commission, and she argued that the guidelines were not "applied correctly" by the Commission. Metro argued that Ms. Todd's contractor, Mr. Martin, had timely notice. Additionally, Metro argued that Ms. Todd had nearly a year to prepare for the de novo hearing in chancery court, and she still did not have an architect or any drawings to present to the court with any proposal. Metro argued that counsel's questions about possible options or other proposals were not properly before the court, as Ms. Todd simply testified that she wanted to keep her porch. Considering Mr. Alexander's testimony regarding the meaning of the guidelines, Metro asked the court to find that the uncovered porch addition was not permitted under the guidelines and should be removed. The chancery court took the matter under advisement at the conclusion of the hearing.

On November 9, 2023, the chancery court entered its written order.[7] At the outset, the court noted that appeals from decisions of the Historic Zoning Commission are by statutory certiorari pursuant to Tennessee Code Annotated section 13-7-409, and review in chancery court is de novo. The chancery court explained that the court's review was not limited to the administrative record, but instead, the court holds a new hearing based on

---

[7] The record does not indicate why two years elapsed between the de novo hearing and the entry of the chancery court's written order.

- 13 -

the administrative record and any additional or supplemental evidence either party wishes to adduce relevant to any issue.

The chancery court found that the previous owner of Ms. Todd's home had remodeled the structure, the renovation was properly permitted, and it included a rear addition and a side addition. The court found that Commission staff inspected that project and marked it satisfactorily completed prior to Ms. Todd's purchase of the home. The court found that Ms. Todd engaged Mr. Martin, after closing, to complete some work at the property and construct a covered rear porch. It found that Commission staff observed construction at Ms. Todd's home on July 23, 2020, "for which no new plans had been reviewed and no permit had been issued." This included a covered porch with a masonry chimney that connected the additions, "wrapping the corner." The chancery court found that Mr. Martin also received an email from Sean Alexander on August 5, 2020, notifying him that the construction of the covered porch was a violation. The court found that Mr. Martin had agreed to stop work on the porch "and explained his intention to apply for retroactive approval of the structure, which application was to be heard at the Commission's August 19, 2020 meeting."

Next, the chancery court's order detailed what occurred at the Commission meeting on August 19, 2020, where the Commission considered the matter as a request for approval after-the-fact. The court described the staff recommendation to require removal of the porch for failure to comply with the design guidelines. The court noted that the Commission ultimately voted to require removal of the porch within ninety days. The chancery court noted that the matter came before the court for an evidentiary hearing on June 30, 2021.

The court first addressed Ms. Todd's argument that her due process rights were violated due to a lack of timely notice of the August 19, 2020 hearing. The court found that Ms. Todd's right to due process was "implicated." However, it explained that basic due process requires notice reasonably calculated under all the circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present objections. The court also noted that the purpose of due process requirements is to notify an individual in advance to allow adequate preparation and reduce surprise. Although Ms. Todd claimed that she only had notice six days (three business days) before the meeting, the chancery court found that Mr. Martin was given adequate notice. The court found that this was "clearly evidenced" by the email in the administrative record dated July 23, 2020, from Mr. Zahn to Ms. Ziegler, which stated:

> Spoke with contractor, Paul Martin, and asked about violation. He said the work had been started by a previous contractor who left the job 1/2 complete, and that he had misunderstood what has and has not been approved. He is stopping work on it and intends to create as-built drawings of the porch and apply by Aug. 3rd to be heard for retroactive approval of the structure by the

- 14 -

MHZC at the Aug. 19th meeting.

The chancery court found that this email demonstrated that Mr. Martin was aware of the violation and the upcoming hearing approximately one month beforehand. The court found that Mr. Martin agreed to stop work and stated his intention of having drawings prepared and applying for retroactive approval by August 3, and therefore, Ms. Todd had adequate time to prepare for the August 19 meeting. The court found that Mr. Martin also received an email from Mr. Alexander on August 5, and he received another notice on August 13 that the addition was on the agenda for the August 19 meeting. The court noted that Mr. Martin and Ms. Todd both spoke at the meeting and were afforded an opportunity to be heard. As such, the court found that Ms. Todd was afforded procedural due process.

Next, the chancery court considered Ms. Todd's argument that the design guidelines "do not address the covered porch and chimney at issue." The court found that the property is located within the Waverly-Belmont Neighborhood Conservation Zoning Overlay, and therefore, construction or alteration of any structure on the property must be approved by the Commission pursuant to Tennessee Code Annotated section 13-7-407. The court quoted the following sections of the design guidelines governing additions:

IV. ADDITIONS

A. Location

1. Generally, an addition should be situated at the rear of a building in such a way that it will not disturb either front or side facades. Additions should be physically distinguished from the historic building and generally fit within the shadow line of the existing building.
    a. Connections to additions should, as much as possible, use existing window and door openings rather than remove significant amounts of rear wall material.
    b. Generally rear additions should inset one foot, for each story, from the side wall.
2. When a lot width exceeds 60 feet or the standard lot width on the block, it may be appropriate to add a side addition to a historic structure.
    a. The addition should sit back from the face of the historic structure (at or beyond the midpoint of the building) and should be subservient in height, width and massing to the historic structure.
    b. Side additions should be narrower than half of the historic building width and exhibit a height of at least 2' shorter than the historic building.
    c. To deemphasize a side addition, the roofing form should generally be a hip or side-gable roof form.

B. Massing

1. In order to assure tha[t] an addition has achieved proper scale, the addition should generally be shorter and thinner than the existing building. Exceptions may be made when unusual constraints make these parameters unreasonable, such as an extreme grade change or an atypical lot parcel shape or size. In these cases, an addition may rise above <u>or</u> extend wider than the existing building; however, generally the addition should not be higher <u>and</u> extend wider.

*a. When an addition needs to be taller:*
*Whenever possible, additions should not be taller than the historic building; however, when a taller addition is the only option, additions to single story structures may rise as high as 4' above ridge of the existing building at a distance of 40' from the front edge of the existing building. In this instance, the side walls and roof of the addition must set in as is typical for all additions. The portion of the roof that can been seen should have a hipped, side gable or clipped gable roof to help decrease the visual mass of the addition.*

*b. When an addition needs to be wider:*
*Rear additions that are wider than an existing historic building may be appropriate when the building is narrower than 30' or shifted to one side of the lot. In these instances, a structural alcove or channel must separate the existing building from the new addition. The structural alcove should sit in a minimum of 1' and be at least twice as long as it is deep.*
*A rear addition that is wider should not wrap the rear corner. It should only extend from the addition itself and not the historic building.*

*. . . .*
F. A new addition should be constructed in such a manner that if the addition were to be removed in the future, the essential form and integrity of the original structure would be unimpaired. Connections should, as much as possible, use existing window and door openings rather than remove significant amounts of rear wall material.

The court found that "[t]he Commission has treated these Guidelines as allowing two separate additions – a rear addition and a side addition -- but not a singular addition that attaches to the rear of a historic house, wraps the corner, and attaches to the side." It found that this interpretation "is in keeping with Section IV.B.1.b of the Guidelines." The chancery court specifically noted, however, that the references in the guidelines that appear in italics contain interpretive information that is meant to make the guidelines easier to understand and are not part of the guidelines themselves.

- 16 -

The chancery court also considered Ms. Todd's contention that outdoor fireplaces or rear porches are not restricted by the guidelines. The court noted that the guidelines define the term "addition" as including "[a]n alteration that changes the exterior height of any portion of an existing building, such as skylights, *covered porches*, covered decks, carports and porte cocheres." (emphasis added). The guidelines further define "new construction" to include any "addition." Thus, the court found that the covered porch and chimney "are clearly additions or structures" within the meaning of the guidelines, so they must comply with the requirements for new construction. The court explained that the guidelines apply to new construction that would have at least a portion visible from a public right-of-way. And, the court found that a two-foot portion of a wall, a two-foot portion of gutter, and the chimney of the covered porch are all visible from a public right-of-way, so the guidelines apply. Because the uncovered porch wraps the corner of Ms. Todd's home continuously, the chancery court concluded that it does not meet the guidelines applicable to rear and side additions. As a result, the court required removal of the porch within ninety days. Ms. Todd timely filed a notice of appeal to this Court.

## II.    ISSUES PRESENTED

Ms. Todd presents three issues for review on appeal, which we quote from her brief:

1.      Whether the Trial Court erred in finding that the due process rights of Petitioner/Appellant, Barbara J. Todd, Trustee of the Barbara Todd 2017 Trust ("Ms. Todd") were not violated when Ms. Todd only received actual notice of the hearing before the Metropolitan Historic Zoning Commission five (5) calendar days (three (3) business days) prior to the hearing.
2.      Whether the Trial Court erred in imputing notice issued to contractor Paul Martin as notice to Ms. Todd.
3.      Whether the Trial Court erred in finding that Ms. Todd's covered porch was not in compliance with the Guidelines, based upon the Trial Court's reliance on italicized and noncontrolling portions of the Guidelines.

In its posture as appellee, Metro argues that the chancery court's decision should be affirmed. For the following reasons, we affirm the decision of the chancery court and remand for further proceedings.

## III.    STANDARD OF REVIEW

This Court has described our standard of review on appeal in cases involving decisions of historic zoning commissions as follows:

> Tenn. Code Ann. § 13-7-409 states that "[a]nyone who may be aggrieved by any final order or judgment of the historic zoning commission

- 17 -

. . . may have such order or judgment reviewed by the courts by the procedure of statutory certiorari." A chancery court's review under the statutory writ is by trial de novo. *McCallen v. City of Memphis*, 786 S.W.2d 633, 638 (Tenn. 1990). Here, "de novo" means that the chancery court's review is not limited to the administrative record. *Tennessee Waste Movers, Inc. v. Loudon County*, 160 S.W.3d 517, 520 (Tenn. 2005). The chancery court holds a new hearing "based upon the administrative record and any additional or supplemental evidence which either party wishes to adduce relevant to any issue." *Id.* (quoting *Frye v. Memphis State Univ.*, 671 S.W.2d 467, 469 (Tenn. 1984)). If the trial court makes the required findings of fact, appellate courts review *the trial court's* factual findings de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (citing Tenn. R. App. P. 13(d)). Appellate courts review questions of law de novo with no presumption of correctness. *Id.*

*MJM Real Est. Invs., LLC*, 2018 WL 1560650, at *3 (emphasis added).

### III.   DISCUSSION

### A.   *Due Process*

Ms. Todd's first argument on appeal is regarding due process. She contends that she only received notice of the hearing before the Commission three business days beforehand, and as a result, she was "unable to retain counsel to represent her interest" and "forced to represent herself at the hearing and attempt to navigate complex legal issues before the MHZC as a layperson." Quoting *McClellan v. Board of Regents of State University*, 921 S.W.2d 684, 688 (Tenn. 1996), Ms. Todd argues that "[t]he purpose of due process requirements is to notify the individual in advance <u>in order to allow adequate preparation and reduce surprise</u>." (emphasis in Ms. Todd's brief). She points to the statements she made at the hearing regarding her bewilderment and inability to gather enough information to "formulate a game plan." Ms. Todd also complains that the Commission did not send any notice of the hearing *to her* but instead sent notice to Mr. Martin, who, she claims, was not her agent. In response, Metro disputes that Ms. Todd had a property right entitled to due process protection. Even if she did, however, Metro argues that Ms. Todd complains about problems with the Commission hearing but fails to identify any evidence that she would seek to introduce in a remand to the Commission, nor does she explain why such evidence could not have been presented to the chancery court at the de novo hearing. Thus, according to Metro, a remand to the Commission "would serve no purpose."

We agree with Metro on this issue. Ms. Todd's due process argument is solely based on the lack of timely notice of the Commission hearing. However, Ms. Todd

- 18 -

subsequently had a de novo hearing in chancery court, meaning "a new hearing" based on not only the administrative record but also "any additional or supplemental evidence which either party wishes to adduce relevant to any issue." *MJM Real Est. Invs., LLC*, 2018 WL 1560650, at *3 (citing *Tennessee Waste Movers, Inc.*, 160 S.W.3d at 520). She was represented by counsel at the de novo hearing. She also testified at the de novo hearing and stated that she had elected not to retain an architect. During oral argument before this Court, Ms. Todd's counsel agreed that Ms. Todd "had adequate time for preparation" before the de novo hearing in chancery court and was represented by counsel. As a result, counsel was asked how the alleged lack of timely notice of the *Commission* hearing was not cured by the time of the de novo hearing in chancery court. Counsel suggested that it was not, but the only reason he gave was that, in his experience, the Commission rarely deviates from the staff recommendations presented at hearings unless neighbors or members of the public are present to oppose the recommendation, so it is important to have proper notice before the Commission hearing. In response, counsel for Metro contended during oral argument that Ms. Todd certainly had plenty of time to prepare for the de novo hearing in chancery court, so it was unclear how a remand to the Commission would provide her with any remedy that she was not already afforded by the de novo hearing.

The Tennessee Supreme Court considered a similar argument in *Cooper v. Williamson County Board of Education*, 746 S.W.2d 176 (Tenn. 1987), a case involving the Teacher Tenure Act. In that case, an initial hearing was held before the county board of education, but the Teacher Tenure Act provided a review provision that was "a species of the statutory writ of certiorari." *Id.* at 178-79. The Court explained that "statutory writs of certiorari may provide for some form of a trial *de novo*." *Id.* at 179. The Teacher Tenure Act provided that "'[t]he hearing shall be de novo and may be on deposition and interrogatories, or on oral testimony.'" *Id.* (quoting Tenn. Code Ann. § 49-5-513(g)). Thus, the teacher could seek judicial review in chancery court, the chancellor would hold a de novo hearing, and the parties could present additional evidence.[8] *Id.* at 180. Upon considering the evidence, the chancellor would enter findings of fact and conclusions of law. *Id.*

Before the Tennessee Supreme Court, the teacher argued that he was denied due process because the board of education was biased against him and had predetermined the outcome of his hearing. *Id.* at 183. The Supreme Court explained,

> Given the availability of a hearing *de novo* in these cases, in which the Chancellor redetermines the merits of the charges and decides whether a board's actions were justified by the evidence, we do not think that whether a board acted arbitrarily or capriciously has any relevance to the status of the teacher because a hearing *de novo* in the Chancery Court readjudicates the

---

[8] Since *Cooper*, amendments to the Teacher Tenure Act have modified its judicial review provisions. *See Finney v. Franklin Special Sch. Dist. Bd. of Educ.*, 576 S.W.3d 663, 675 (Tenn. Ct. App. 2018).

matter in a neutral forum, completely eliminating any arbitrariness or capriciousness in the board's decision, which is not afforded a presumption of correctness. . . . [A]ny arbitrariness or capriciousness on the part of the board is cured by the hearing *de novo*. Raising this issue in the Chancery Court seems to be a holdover from petitions for the *common law* writ of certiorari but it is not generally appropriate under the Teacher Tenure Act, which permits review of the administrative decision by a species of the *statutory* writ of certiorari and contemplates a much broader scope of review both of facts and of law to decide the case on its merits.

*Id.* at 183-84 (emphasis added).

In another case, *Phillips v. State Board of Regents of the State University and Community College System of the State of Tennessee*, 863 S.W.2d 45, 50 (Tenn. 1993), the Tennessee Supreme Court considered a due process argument regarding the adequacy of notice provided to a terminated professor. The professor argued that "she was denied due process because she was not informed of the specific details of each allegation of deficient conduct supporting the general statutory charge against her." *Id.* She claimed that "the statutory ground for discharge was too vague to inform the appellant of the nature of the offense." *Id.* at 47. Our Supreme Court rejected this argument, explaining:

A fundamental requirement of due process is notice and an opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Co.* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *In Re Riggs*, 612 S.W.2d 461, 465 (Tenn. App. 1980). The purpose of notice is to allow the affected party to marshal a case against the firing body. *Bignall v. North Idaho College*, 538 F.2d 243, 247 (9th Cir. 1976).

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). In determining what process is due in a particular situation, three factors must be considered: (1) the private interest affected by the official action; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and finally, (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Moreover, the component parts of the process are designed to reach a substantively correct result. Elaborate procedures at one stage may compensate for deficiencies at other stages. *Bignall*, 538 F.2d at 246.

In this case, Phillips received notice of the allegations supporting the charge against her in the documentation attached to the letter instituting

- 20 -

termination proceedings. She was afforded the benefit of both an informal and formal hearing, in which further specific details of the allegations were developed. Finally, Phillips had a *de novo* hearing in the Chancery Court pursuant to Tenn. Code Ann. § 49-8-304 (1990), which was conducted in accordance with the procedures set forth in *Frye v. Memphis State Univ.*, 671 S.W.2d 467 (Tenn. 1984).

*We do not deem it necessary to decide whether the documentation attached to the letter was sufficiently specific to satisfy due process at that early stage of the procedure because we conclude that sufficient notice of the specific details of the allegations supporting the charge was provided, at least by the time of the de novo hearing in Chancery.* See Bignall, 538 F.2d at 248 (although the notice prior to the hearing was defective, by the time of the trial de novo there was ample notice to satisfy due process). Given the availability of the hearing *de novo* in which Phillips was allowed to present further evidence to refute the specific details of allegations of which she may not have been aware at the time of the formal hearing, and the fact that there is no presumption of correctness afforded the decision of the administrative board, we conclude that the component parts of the process afforded a substantively correct result. *Cf. Cooper v. Williamson County Bd. of Educ.*, 803 S.W.2d 200, 201 (Tenn. 1990) (a hearing de novo in Chancery re-adjudicates the matter in a neutral forum, completely eliminating any arbitrariness or capriciousness in the board's decision, which is not afforded a presumption of correctness). We, therefore, hold that the claim of inadequate notice is without merit, and there was no violation of due process.

*Id.* at 50-51 (emphasis added).

Finally, in *Wells v. Tennessee Board of Regents*, 9 S.W.3d 779, 787 (Tenn. 1999), our Supreme Court clarified the holding in *Phillips* and reached the same conclusion regarding another alleged violation of due process for insufficient notice:

Our decision in *Phillips v. State Bd. of Regents*, 863 S.W.2d 45, does not hold that formal notice of each allegation of deficient conduct is required before termination proceedings can be initiated against a tenured employee. Rather, in that case we observed that while the fundamental requirements of due process must be satisfied (notice and an opportunity to be heard) in tenure termination proceedings, *see Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), due process is flexible and "[e]laborate procedures at one stage may compensate for deficiencies at other stages," *see Phillips v. State Bd. of Regents*, 863 S.W.2d at 50 *quoting Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). The primary purpose of the notice requirement is "to allow the affected party to marshal a case against the firing body." *See*

- 21 -

*Phillips v. State Bd. of Regents*, 863 S.W.2d at 50. Applying these guidelines, we determined that although Phillips claimed she was not given sufficiently detailed notice of the charges against her, by the time she received a *de novo* review in Chancery Court she had received detailed notice *and was capable of presenting additional evidence to refute the allegations against her. See id*. at 50.

Like in *Phillips v. State Bd. of Regents*, 863 S.W.2d at 50-51, we conclude that in this case "the component parts of the process afforded a substantively correct result." Dr. Wells initially received notice of the charges against him in the form of a letter, issued by TSU, alerting him to the allegations of sexual harassment. He was then afforded two full administrative hearings at which he was permitted to testify and present witnesses. Finally, Dr. Wells received a de novo review of his case in Chancery Court, where he again testified and presented witnesses. Any alleged due process deficiency was certainly cured at the time of the Chancery Court hearing, which occurred eight years after charges were initiated against him.

*Id. See also In re C.M.*, No. M2014-02571-COA-R3-JV, 2015 WL 9311287, at *14 (Tenn. Ct. App. Dec. 18, 2015) ("[D]ue process is satisfied when proceedings in one tribunal give notice of the allegations prior to a de novo appeal in the second tribunal. Under such circumstances, the parties have full notice of the allegations and full opportunity to present their defense; accordingly, there is no risk of erroneous deprivation.") (citation omitted).

As in *Phillips*, we "do not deem it necessary to decide" whether the notice provided prior to the hearing before the Commission was timely or adequate because we conclude that Ms. Todd had sufficient notice and sufficient time to prepare before the de novo hearing in chancery court. 863 S.W.2d at 50. The only harm that Ms. Todd identifies in her brief on appeal from the untimely notice was that she did not have time to retain counsel before the Commission meeting. However, she was represented by counsel at the de novo hearing in chancery court. Assuming arguendo that Ms. Todd possessed an interest that triggered due process requirements, any alleged due process deficiency in the notice was certainly cured by that time.[9] *See id.*

### B.    The Guidelines

---

[9] In her brief on appeal, Ms. Todd also argues that notice of the Commission hearing was not provided in accordance with the contested hearing requirements of the Uniform Administrative Procedures Act, Tenn. Code Ann. § 4-5-307. In her reply brief, she additionally argued that notice was not provided in accordance with certain provisions of the Metro Code. However, neither of these arguments was raised in the proceedings below. Therefore, they cannot be raised for the first time on appeal. *See Martin v. Rolling Hills Hosp., LLC*, 600 S.W.3d 322, 336 (Tenn. 2020) (quoting *State v. Rowland*, 520 S.W.3d 542, 545 (Tenn. 2017)) ("[A]s a general rule, 'issues raised for the first time on appeal are waived.'").

The final issue raised by Ms. Todd is "[w]hether the Trial Court erred in finding that Ms. Todd's covered porch was not in compliance with the Guidelines, based upon the Trial Court's reliance on italicized and noncontrolling portions of the Guidelines." According to her reply brief, "Ms. Todd does not assert that the covered porch complies with the Guidelines. Conversely, Ms. Todd alleges that the Guidelines, as written, do not apply to the covered porch." Ms. Todd raises several arguments as to why she believes the guidelines did not apply to her porch.

First, Ms. Todd relies on the general bullet points in the margin at the beginning of the guidelines listing items that are reviewed and items that are not reviewed in a neighborhood conservation zoning overlay. For items that are reviewed, the list includes "Additions – increased footprint, height or building envelope of an existing structure." For "what is not reviewed," it included "[w]ork that cannot be seen from the public right-of-way (not including alleys)," but this bullet point included a cautionary instruction that in order to avoid a possible violation, "the project should be evaluated by staff for assurance that a Preservation Permit is not necessary." Based on these bullet points, Ms. Todd argues on appeal that only work visible from the road is subject to design review. She concedes that Mr. Alexander testified that portions of the porch can be seen from the road, including the chimney, a portion of the wall, a portion of the roof, part of the gutter, and a little bit of siding. However, Ms. Todd claims that Mr. Alexander never stated that the "wrapped corner" can be seen from the right-of-way, and therefore, she argues, "the allegedly wrapped corner is not subject to the Guidelines because it cannot be seen from the public right-of-way."

At the de novo hearing in chancery court, Mr. Alexander was asked about these bullet points and Ms. Todd's interpretation of them. When Ms. Todd's counsel asked Mr. Alexander if this means that "you only govern what's seen from the street," Mr. Alexander disagreed with this interpretation. He pointed out that the guidelines state, "These guidelines shall apply only to the exteriors of buildings and to *new construction that would have at least a portion visible* from a public right-of-way." (emphasis added). The guidelines defined the term "new construction" to include an "addition." In turn, they defined an "addition" to include "covered porches." As such, as Mr. Alexander explained, the guidelines apply to the addition if at least a portion is visible from the street. He explained that if *no* portion of an addition was visible from the street, then it would not necessarily need a preservation permit. We agree with Mr. Alexander's interpretation. The guidelines state that they apply to "new construction," which would include an addition (and a covered porch), if at least a portion is visible from the public right-of-way. Thus, the guidelines apply to Ms. Todd's addition because it is undisputed that a portion of it is visible.[10]

---

[10] In her reply brief, Ms. Todd states that "the trial record reflects that Ms. Todd offered to remove all portions of the covered porch which are visible from the public right of way," but "Metro refused Ms. Todd's offer." However, the only citation to the record provided in support of this statement references the

Next, Ms. Todd acknowledges that her covered porch was not approved because it wraps the corner continuously, but she argues that "[n]othing in the controlling portions of the Guidelines refers to 'wrapping the corner.'" Because the only explicit reference to wrapping the corner was found in italicized text, Ms. Todd argues that the Commission and the chancery court "simply treated the noncontrolling italicized language regarding wrapping the corner as part of the Guidelines." We find no support for this assertion. The chancery court's order expressly stated, "All references in the Guidelines that appear in italics 'contain interpretive information that is meant to make the guidelines easier to understand; they are not part of the guidelines themselves.'"[11] After quoting at length the detailed sections of the guidelines governing rear additions and side additions, the chancery court found that the Commission "has treated these Guidelines as allowing two separate additions – a rear addition and a side addition – but not a singular addition that attaches to the rear of a historic house, wraps the corner, and attaches to the side."[12] The chancery court found that Ms. Todd's porch wraps the corner continuously, so its porch and chimney "do not meet Sections IV.A.1, IV.A.2 and IV.B.1.b of the Guidelines for rear and side

---

testimony of Mr. Alexander at the de novo hearing in chancery court. During this testimony, Mr. Alexander was asked if he was "aware" that Ms. Todd had offered to remove portions of the gutters and roof that could be seen from the right-of-way and responded, "I was not aware of that. I read something to that effect in your brief, but that was never communicated to me by Ms. Todd or Mr. Martin." He added, "I did not see, read or receive any communication from you, you say her representation, regarding a solution." Counsel then asked Mr. Alexander "would it surprise you to know then that an offer was made to remove all portions of that roof and gutter that are visible from the right-of-way and that offer was refused?" He responded, "I would be surprised if I were to hear that that were offered." Finally, counsel asked, "And you testify again that you're not aware that Ms. Todd made any proposals to make revisions to the structure, to remove portions of the roof, remove portions of the gutter that are visible from the street." He replied, "Not that I recall. No. I don't believe she communicated with me at all."

Mr. Alexander's testimony reflects that he had no knowledge of any offer to remove portions of the porch, aside from counsel's suggestion that it occurred. However, counsel's statements and questions are not evidence. *See Cooper v. State*, No. E2022-01776-CCA-R3-PC, 2024 WL 4143828, at *42 (Tenn. Crim. App. Sept. 11, 2024) ("It is fundamental that an attorney's questions, comments, and arguments are not evidence."); *State v. Guilfoy*, No. M2012-00600-CCA-R3-CD, 2013 WL 1965996, at *18 (Tenn. Crim. App. May 13, 2013) (explaining that a prosecutor's "suggestive phrasing and leading questions did not cure [the] lack of specificity in the proof" because an attorney's questions are not evidence); *State v. Ballinger*, No. 03C01-9206-CR-00223, 1993 WL 247941, at *1 n.2 (Tenn. Crim. App. July 7, 1993) ("[T]he defendant attempted to set forth some proof through his phrasing of his cross-examination of State witnesses; however, it is well established that attorneys' questions and comments are not evidence and, therefore, may not be considered as such in our review."). Because Ms. Todd relies solely on Mr. Alexander's testimony in support of this argument, we decline to consider it on appeal.

[11] Ms. Todd also argues on appeal that the Commission staff has attempted "to circumvent the legislative and statutory process for the Guidelines set forth in T.C.A. §13-7-406." However, she does not cite to any portion of the record to demonstrate that this argument was raised in the proceedings below, so we deem it waived. *See Martin*, 600 S.W.3d at 336; Tenn. Ct. App. R. 6.

[12] Mr. Alexander testified in detail regarding the Commission's reasoning for this, even though the sections on additions admittedly did not contain the language "wrapping the corner." However, we reiterate that Ms. Todd "does not assert that the covered porch complies with the Guidelines," but rather, "that the Guidelines, as written, do not apply to the covered porch."

additions." The chancery court did not improperly treat the noncontrolling italicized language as binding, as Ms. Todd suggests.

Finally, Ms. Todd relies on a drawing that was located in the margin of the design guidelines next to the section regarding rear additions. The guidelines stated that additions should generally be located at the rear of the building in such a way that it would not disturb the front or side facades and should generally fit within the shadow line of the building. The following drawing appears in the margin:



Ms. Todd argues on appeal that the drawing on the right depicts an addition that "wraps a corner continuously," which shows, in non-italicized language, that "wrapping the corner [i]s an acceptable rear addition." However, Mr. Alexander was asked about this drawing at the de novo hearing, and he explained that it depicts "an entirely different situation." He noted that the drawing depicts a rear addition that is entirely within the shadow line or silhouette of the house, and it does not wrap the back exterior corner of the home but merely an interior corner. Mr. Alexander suggested that the drawing may have been intended to show an example when a previous addition had been added. However, he noted that the shaded addition in the drawing did not wrap a corner of the original house in a manner that would be visible from the public right-of-way. Thus, the addition in the drawing would still be considered "an entirely rear addition." He also noted that the drawings did not include any "side addition component." Mr. Alexander deemed Ms. Todd's porch an "entirely different scenario." Thus, he rejected the idea that this drawing authorizes an addition like Ms. Todd's that extends across the back and wraps the corner of the historic home to connect to a side addition. We are persuaded by Mr. Alexander's explanation that this drawing does not authorize "wrapping the corner" in the manner suggested by Ms. Todd. It depicts additions that are entirely at the rear of the home, not additions that wrap around a rear exterior corner to connect to a side addition. Thus, Ms. Todd's argument regarding the drawing does not entitle her to relief on appeal.

## IV. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is affirmed and

remanded.  Costs of this appeal are taxed to the appellant, Barbara J. Todd, Trustee of the Barbara Todd 2017 Trust, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE